United States Bankruptcy Court
Southern District of Texas

**ENTERED**
July 27, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 24-35380** |
| **CRISTINA MARIA NASWARI, MAX WILLIAMS,** | § | |
| | § | **CHAPTER 7** |
| Debtors. | § | |
| | § | |
| **LENDBUZZ FLOORPLAN, LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 25-3052** |
| | § | |
| **CRISTINA NASWARI,** | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

Lendbuzz Floorplan, LLC financed Auto Expo LLC's purchase of used vehicles. Cristina Maria Naswari guaranteed Auto Expo LLC's obligations to Lendbuzz Floorplan, LLC. Through this adversary proceeding, Lendbuzz Floorplan, LLC seeks a determination that the debt arising from eight (8) vehicles sold out of trust constitutes a willful and malicious injury to Lendbuzz Floorplan, LLC and is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6). On June 25, 2026, the Court conducted a one-day trial and, for the reasons stated herein, finds that Lendbuzz Floorplan, LLC failed to meet its burden of proving the existence of a debt owed to it by Cristina Maria Naswari and therefore, Lendbuzz Floorplan, LLC's nondischargeability claim under 11 U.S.C. § 523(a)(6) fails as a matter of law.

## I.   FINDINGS OF FACT

This Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure ("*Rule*") 52, which is made applicable to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure ("*Bankruptcy Rule*") 7052. To the extent that any finding of fact constitutes a conclusion of law, it is adopted as such. To the extent that any conclusion of law constitutes a finding of fact, it is adopted as such. This Court made certain oral findings and conclusions on the record. This Memorandum Opinion supplements those findings and conclusions. If there is an inconsistency, this Memorandum Opinion controls.

### A.   Background

1. On November 15, 2024 (the "*Petition Date*"), Cristina Maria Naswari ("*Debtor*" or "*Defendant*") filed for bankruptcy protection under chapter 7 of the Bankruptcy Code,[1] initiating the bankruptcy case. Bankr. ECF No. 1.[2]

2. On February 14, 2025, Lendbuzz Floorplan, LLC ("*Plaintiff*" or "*Lendbuzz*") timely filed the instant adversary complaint (the "*Complaint*"). ECF No. 1.

3. On March 17, 2025, Defendant filed her answer to the Complaint ("*Answer*"). ECF No. 5.

4. On October 3, 2025, Plaintiff filed its Motion for Summary Judgment, ECF No. 14, which the Court denied on October 20, 2025. ECF No. 16.

5. On November 21, 2025, Plaintiff and Defendant filed their Joint Pretrial Statement. ECF No. 27.

6. On June 25, 2026, the Court held a one-day trial and now issues the instant Memorandum Opinion.

---

[1] Any reference to "Code" or "Bankruptcy Code" is a reference to the United States Bankruptcy Code, 11 U.S.C., or any section (i.e.§) thereof refers to the corresponding section in 11 U.S.C.

[2] "Bankr. ECF" refers to docket entries made in the Debtor's bankruptcy case, No. 24-35380. Entries made in Plaintiff's Case number 25-3052 shall take the format of ECF No. __.

## II.   CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334 and exercises its jurisdiction in accordance with Southern District of Texas General Order 2012-6. *In re: Order of Reference to Bankruptcy Judges*, Gen. Order 2012-6 (S.D. Tex. May 24, 2012). Section 157 allows a district court to "refer" all bankruptcy and related cases to the bankruptcy court, wherein the latter court will appropriately preside over the matter. 28 U.S.C. § 157(a); *see also In re: Order of Reference to Bankruptcy Judges*, Gen. Order 2012-6 (S.D. Tex. May 24, 2012). This court determines that pursuant to 28 U.S.C. § 157(b)(2)(I) and (O), this proceeding contains core matters, as it primarily involves proceedings concerning dischargeability of particular debts. *See* 28 U.S.C. § 157(b)(2)(I) & (O). This proceeding is also core under the general "catch-all" language because such a suit is the type of proceeding that can only arise in the context of a bankruptcy case. *See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.") (quoting *Wood v. Wood (In re Wood),* 825 F.2d 90, 97 (5th Cir. 1987)).

This Court may only hear a case in which venue is proper. 28 U.S.C. § 1408. 28 U.S.C. § 1409(a) provides that "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending." Debtor's bankruptcy case is pending in this Court and therefore, venue of this proceeding is proper.

### B.  Constitutional Authority to Enter a Final Order

While bankruptcy judges can issue final orders and judgments for core proceedings, absent consent, they can only submit proposed findings of fact and conclusions of law to the district court

on non-core matters. *See* 28 U.S.C. §§ 157(b)(1), (c)(1); *see also Stern v. Marshall*, 564 U.S. 462, 480 (2011); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 671 (2015). The determination as to the dischargeability of particular debts pending before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Accordingly, this Court concludes that the narrow limitation imposed by *Stern* does not prohibit this Court from entering a final order here. *See, e.g.*, *Badami v. Sears (In re AFY, Inc.),* 461 B.R. 541, 547–48 (B.A.P. 8th Cir. 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *see also Tanguy v. West (In re Davis)*, 538 F. App'x 440, 443 (5th Cir. 2013) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect' .... We decline to extend *Stern's* limited holding herein.") (citing *Stern*, 564 U.S. at 475, 503). Alternatively, this Court has constitutional authority to enter a final order because all parties in interest have consented, impliedly if not explicitly, to adjudication of this dispute by this Court. *See Wellness Int'l Network, Ltd.*, 575 U.S. at 683 ("*Sharif* contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . ."). None of these parties has ever objected to this Court's constitutional authority to enter a final order or judgment. *See* ECF Nos. 13, 17. These circumstances unquestionably constitute implied consent. *See Wellness Int'l Network, Ltd.,* 575 U.S. at 683. Thus, this Court wields the constitutional authority to enter a final order here.

### III.   ANALYSIS

## A. Factual Background

### 1. Introduction

The Debtor was the sole member of Auto Expo LLC ("*Auto Expo*"), a company she started in May 2020. June 25, 2026 Trial (Debtor testifying). Auto Expo was a Texas limited liability company that owned and operated a used car dealership. *Id.* Before opening Auto Expo, Debtor had experience in the auto industry, including working as a title clerk for a Volvo dealership and operating a small car dealership in California before relocating to Texas. *Id.* In addition to Lendbuzz, Auto Expo obtained floor plan financing from lenders known as Westlake Flooring, Kinetic, and NextGear. *Id.*

### 2. The Floorplan Agreement and Personal Guaranty

On November 28, 2022, Auto Expo entered into a Demand Floorplan Note and Security Agreement (the "*Floorplan Agreement*") with Lendbuzz. ECF No. 18, Ex. 1. Pursuant to the Floorplan Agreement, Lendbuzz provided an open line of credit in the principal amount of approximately $200,000.00 to Auto Expo for the purpose of financing Auto Expo's purchase of motor vehicle inventory. ECF No. 27, at 3; June 25, 2026 Trial (Mr. Devaney testifying). To secure the performance and payment of all obligations under the Floorplan Agreement, Auto Expo granted Lendbuzz a security interest in Auto Expo's assets including, but not limited to, its motor vehicle inventory, consigned goods, and proceeds from the sale thereof (collectively, the "*Collateral*"). ECF No. 18, Ex. 1 at 3. Lendbuzz perfected its security interest by filing a UCC-1 Financing Statement with the Texas Secretary of State on December 2, 2022. ECF No. 27 at 3; June 25, 2026 Trial (Mr. Devaney testifying).

On November 28, 2022, in consideration of the loans to Auto Expo, Debtor executed a Personal Guaranty (the "*Guaranty*") of Auto Expo's obligations to Lendbuzz under the Floorplan Agreement. ECF No. 18, Ex. 2. Pursuant to the Guaranty, Debtor "personally, absolutely and unconditionally guarantee[d] the full and punctual payment" of all sums due and owing to Lendbuzz under the Floorplan Agreement. ECF No. 18, Ex. 2 at 1. The Floorplan Agreement required Auto Expo to promptly pay and deliver to Lendbuzz all proceeds realized from the sale or lease of financed vehicles. ECF No. 18, Ex. 1 at 5. The Floorplan Agreement specifically provided that "any proceeds received by [Auto Expo], whether in the form of checks, drafts, credit card drafts, or otherwise, shall be the property of Lendbuzz, and at all times while [Auto Expo] may hold such cash or cash-equivalent proceeds, [Auto Expo] shall do so 'in trust' for and on behalf of Lendbuzz." *Id.* The Floorplan Agreement further stated that "Lendbuzz and [Auto Expo] intend and agree that there shall be a true trust relationship between Lendbuzz and [Auto Expo], with [Auto Expo] assuming full fiduciary duties, responsibilities, and Obligations to and in favor of Lendbuzz." *Id.* Debtor understood that when a financed vehicle was purchased, and Auto Expo received proceeds from the purchase, Auto Expo would be required to pay the proceeds to Lendbuzz pursuant to the Floorplan Agreement. June 25, 2026 Trial (Debtor testifying).

### 3. Transfers out of trust

Auto Expo's business began to struggle in March 2023. June 25, 2026 Trial (Debtor testifying). By March 2023, the only inventory remaining on Auto Expo's lot consisted of vehicles financed by Lendbuzz. *Id.* Between March 2023 and August 2023, Auto Expo continued to sell vehicles financed by Lendbuzz. *Id.* Through a July 2023 audit, Lendbuzz discovered that eight (8) vehicles were missing from Auto Expo's inventory (the "*Missing Inventory*"). ECF No. 18, Ex. 4

at 68–71; June 25, 2026, Trial (Mr. Devaney testifying). The Missing Inventory consisted of the

following eight (8) vehicles for which Lendbuzz seeks a nondischargeability determination:

| Year | Make/Model | VIN | Stock# | Balance Owed |
|---|---|---|---|---|
| 2014 | GMC Sierra 1500 Crew Cab | 3GTP1UEC3EG546574 | 2525 | $15,316.31 |
| 2012 | Dodge Challenger | 2C3CDYAGXCH293471 | 2855 | $11,491.77 |
| 2015 | Jeep Cherokee | 1C4PJMBS0FW790312 | 3573 | $9,368.91 |
| 2014 | Hyundai Sonata | 5NPEC4AB3EH817140 | 3787 | $3,499.38 |
| 2017 | Ram 1500 Crew Cab | 1C6RR7LTXHS699592 | 3790 | $14,389.31 |
| 2017 | Chevrolet Camaro | 1G1FB1RS1H0177059 | 3792 | $13,620.25 |
| 2006 | Mitsubishi Outlander | JA4LX41F86U009866 | 3793 | $2,884.13 |
| 2013 | Mini Countryman | WMWZC5C58DWP31472 | 3794 | $3,755.74 |
|  |  |  | Total | $74,325.80 |

Debtor admitted that neither she nor Auto Expo paid the proceeds from the sale of the

Missing Inventory to Lendbuzz as required by the Floorplan Agreement. June 25, 2026, Trial

(Debtor testifying). The Missing Inventory was sold at some time between March and August

2023. *Id.* And during that same time period, the only inventory that Auto Expo sold was Auto

Expo's collateral. *Id.* Debtor testified that following Auto Expo's March 2023 struggles, she had

creditors coming "left and right" and "taking money from [her] bank account." *Id.* Debtor testified

that, although she attempted to have Auto Expo remit the proceeds from the sale of Lendbuzz's

collateral to Lendbuzz, she was unable to do so because other creditors were automatically debiting

funds from the bank account into which those proceeds were deposited. *Id.* As Debtor explained

it: "every time I would … try to turn over the funds, the funds would be gone because somebody

took it." *Id.* Auto Expo finally ceased operations around June or July 2023.

### B.      Credibility of Witnesses

It is the Court's duty to assess and weigh the credibility of witnesses. *O'Connor v. Burg (In re Burg)*, 641 B.R. 120, 128 (Bankr. S.D. Tex. 2022); *Amegy Bank Nat'l Assoc. v. Brazos M&E, Ltd. (In re Bigler LP)*, 458 B.R. 345, 367 (Bankr. S.D. Tex. 2011) (citing *Port Arthur Towing Co. v. John W. Towing, Inc. (In re Complaint of Port Arthur Towing Co.*), 42 F.3d 312, 318 (5th Cir. 1995)). At the June 25, 2026 trial, the Court heard testimony from the following witnesses: (1) Mr. Kevin Devaney ("*Mr. Devaney*") and (2) Debtor. Mr. Devaney entered the auto floorplan financing business in 2008 and worked in the industry for approximately fifteen years before joining Lendbuzz. June 25, 2026, Trial (Mr. Devaney testifying). He has served as Lendbuzz's Senior Director of Floorplan Financing for approximately four years. *Id.* In that role, he oversees the company's floorplan financing business nationwide and is responsible for approximately 280 floorplan accounts. *Id.* Mr. Devaney is also familiar with the business relationship between Auto Expo and Lendbuzz. *Id.* Each witness responded to questions clearly, completely, and directly. *See, e.g.*, *Ali v. Merchant (In re Ali)*, Nos. 13-50724-CAG, 13-05083-CAG, 2015 Bankr. LEXIS 2443, at *11–15 (Bankr. W.D. Tex. July 23, 2015) (analyzing the clarity, completeness, and quality of witness responses to make credibility determinations). Thus, the Court finds that each witness is credible and gives substantial weight to the testimony of each witness.

### C.  Applicable standard

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The Supreme Court has developed guidelines for determining whether a debt arises from a willful and malicious injury under § 523(a)(6). *Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 508 (5th Cir. 2003) (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 59 (1998)). The Supreme Court has held

that § 523(a)(6) applies only to "acts done with the actual intent to cause injury" and does not discharge debts arising from negligently or recklessly inflicted injuries. *Kawaauhau*, 523 U.S. at 59. The Fifth Circuit has interpreted the Supreme Court's guidance that § 523(a)(6) requires actual intent to cause injury to hold that "[t]he test for willful and malicious injury under Section 523(a)(6), thus, is condensed into a single inquiry of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor." *Williams*, 337 F.3d at 509. If the Court finds that the debtor acted with substantial certainty of harm or a subjective motive to cause harm, the conduct is still not willful and malicious unless the Court also finds that the acts were not "sufficiently justified under the circumstances." *Berry v. Vollbracht (In re Vollbracht)*, 276 F. App'x 360, 362 (5th Cir. 2007).

"[W]hen a security agreement is involved, if the creditor can show that the debtor deliberately and intentionally failed to remit proceeds of collateral to a secured party, as required under a security agreement, the creditor may be able [sic] prevail on a claim of nondischargeability under § 523(a)(6)." *Comerica Bank v. Rajabali (In re Rajabali)*, 365 B.R. 702, 711 (Bankr. S.D. Tex. 2007); *see also Mabank Bank v. Grisham (In re Grisham)*, 245 B.R. 65, 74 (Bankr. N.D. Tex. 2000); *Triumphant Gold Ltd. v. Matloff (In re Matloff)*, No. 24-10439, 2025 LX 401484, at *49 (5th Cir. Oct. 8, 2025). The burden of proof is on the creditor to establish "by a preponderance of the evidence that his claim is not dischargeable." *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

### D.    The underlying debt

There are two distinct issues to consider in the dischargeability analysis: (a) the establishment of the debt itself, under relevant state or non-bankruptcy federal law; and (b) a determination as to the nature of the debt: whether it is dischargeable or nondischargeable. *Resolution Tr. Corp. v. McKendry (In re McKendry)*, 40 F.3d 331, 337 (10th Cir. 1994) (noting

that there are two distinct issues in a nondischargeability proceeding); *Winn v. Holdaway (In re Holdaway)*, 388 B.R. 767, 782 (Bankr. S.D. Tex. 2008) ("The underlying cause creating the pre-petition debt must not be confused with the characterization of debts excepted from discharge."); *Estate of Smith v. Smith (In re Smith)*, 495 B.R. 291, 297 (Bankr. N.D. Miss. 2013) (holding that a claim must first be established under relevant state or non-bankruptcy law and only then does the federal nondischargeability issue come into play); *King v. Skolness (In re King)*, 624 B.R. 259, 287 (Bankr. N.D. Ga. 2020) ("The first step is to determine whether a debt exists. If the debtor owes a debt to the plaintiff, the second step is to determine the nature of the debt—i.e. whether it is dischargeable or nondischargeable."). The plaintiff has the initial burden of establishing the underlying debt. *Winn*, 388 B.R. at 779.

The debt alleged to be nondischargeable arises from Debtor's failure to cause the Missing Inventory or their proceeds to be returned to Lendbuzz. ECF No. 27 at 1; ECF No. 1. Lendbuzz failed to assert any specific state law cause of action that could give rise to liability. *See* ECF No. 1. But because Lendbuzz, through its Complaint and the evidence presented at trial, relied on breach of the Guaranty and the Floorplan Agreement, ECF No. 1, the Court will analyze the underlying debt under a breach of contract analysis. *See* FED. R. CIV. P. 15(b) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."); *Haught v. Maceluch*, 681 F.2d 291, 305 (5th Cir. 1982).

To prevail on a breach of contract claim, Lendbuzz must prove, by a preponderance of the evidence: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach by the defendants; and (4) damages sustained as a result of that breach." *Cty. Real Estate Venture v. Farmers & Merchs. Bank*, No. 01-13-00530-CV, 2015 Tex. App. LEXIS 1409, at *3 (Tex. App. Feb. 12, 2015).

Here, Lendbuzz and Auto Expo entered into the Floorplan Agreement that required Auto Expo to promptly remit proceeds of the Missing Inventory to Lendbuzz upon their sale. ECF No. 18, Ex. 1. Under the Guaranty, Debtor agreed to be liable for any of Auto Expo's liability arising from the Floorplan Agreement. ECF No. 18, Ex. 2. Debtor admits that Auto Expo sold the Missing Inventory but did not turn over the proceeds to Lendbuzz. June 25, 2026 Trial (Debtor testifying). Auto Expo thus breached the Floorplan Agreement by transferring the Missing Inventory and their proceeds out of trust. Under the Guaranty, Debtor would be liable for damages arising out of Auto Expo's breach. *See* ECF No. 18, Ex. 2.

"The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained. By the operation of that rule, a party generally should be awarded neither less nor more than his actual damages." *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex. App. 2000) (citations omitted). "To restore an injured party to the position he would have been in had the contract been performed, it must be determined what additions to the injured party's wealth have been prevented by the breach and what subtractions from his wealth have been caused by it." *Id.* As a result of Auto Expo's breach, Lendbuzz was deprived of the value of the Missing Inventory and their proceeds. Put differently, had Auto Expo not breached the Floorplan Agreement by making the transfers out of trust, Lendbuzz would have recovered the Missing Inventory or their proceeds and applied them toward satisfying the loan amount secured by the Missing Inventory. According to Lendbuzz's payoff records, an outstanding balance of $74,325.80 was secured by the Missing Inventory. ECF No. 18, Ex. 3.

However, Lendbuzz offered no evidence of the value of the Missing Inventory or how much Auto Expo netted from the sale of the Missing Inventory. There is no evidence to demonstrate that the outstanding balance accurately represents the value of the Missing Inventory

or their proceeds. It is axiomatic that the value of collateral is not necessarily equivalent to the amount of debt it secures. *See, e.g.*, *In re Blount*, 276 B.R. 753, 756 (Bankr. M.D. La. 2002) (finding that the difference between the amount of the debt and the value of the collateral constituted unsecured claim). Indeed, the outstanding balance of $74,325.80 includes fees and interest, which Lendbuzz has not shown are related to the value of the Missing Inventory. *See* ECF No. 18, Ex. 1. Lendbuzz provided a loan payoff record showing the principal amount of the loan on each of the Missing Inventory at the time Auto Expo acquired the Missing Inventory. *See id.* But it is not clear whether the principal amount represents the value of the Missing Inventory, and there has been no evidence regarding wear and tear, depreciation, or other factors that could bear on the value of the Missing Inventory. *See id.*

This Court is mindful that damages only need be calculated with "reasonable certainty, not mathematical precision." *O & B Farms v. Black*, 300 S.W.3d 418, 422 (Tex. App. 2009). But in this case, other than showing the loan balance secured by the Missing Inventory, Lendbuzz has provided no evidence whatsoever on damages calculations. "[A]n award of damages cannot rest solely on speculation." *Weaver v. Jock*, 717 S.W.2d 654, 661 (Tex. App. 1986). Moreover, Lendbuzz has not shown that the evidence necessary to establish the amount of its damages was unavailable through no fault of its own, nor has Lendbuzz explained why such evidence was not presented. *See State v. Buckner Constr. Co.*, 704 S.W.2d 837, 843 (Tex. App. 1985) ("To prove [damages] amount, the injured party must produce the best evidence available" that "sufficiently provides a reasonable basis for determining his loss."). Therefore, the Court finds that Lendbuzz has not met its burden of demonstrating the amount of damages caused by Auto Expo's transfer of the Missing Inventory and their proceeds out of trust. Consequently, Lendbuzz has not

demonstrated a debt owed to it by Debtor under the Floorplan Agreement and Guaranty. *See Cty. Real Estate Venture*, 2015 Tex. App. LEXIS 1409, at \*3.

In a § 523(a)(6) action, the underlying debt must be attributable to the conduct that was willful and malicious. *See Mahadevan v. Bikkina* (*In re Mahadevan*), 617 F. Supp. 3d 654, 666 (S.D. Tex. 2022). The only action alleged to be willful and malicious is that Debtor caused the Missing Inventory and their proceeds to be transferred out of trust. ECF No. 1, at 3, ¶ 11, at 5, ¶ 23. Therefore, the Court need not consider whether Debtor is liable for the full amount of the $185,873.54 allegedly owed under the Floorplan Agreement and Guaranty to the extent that it is owed merely on a default of payment under the Floorplan Agreement and Guaranty. *See* ECF No. 1 at 4.

Accordingly, for purposes of this § 523(a)(6) action, Plaintiff has not demonstrated that Debtor owes an underlying debt to Plaintiff. The Court "cannot declare a debt nondischargeable until the creditor establishes the existence and amount of that debt." *Parker v. Miller* (*In re Miller*), 589 B.R. 550, 560-61 (Bankr. S.D. Miss. 2018); *see also Husky Int'l Elec., Inc. v. Ritz* (*In re Ritz*), 832 F.3d 560, 562 (5th Cir. 2016) (noting on remand from the Supreme Court that if "there is no debt to discharge[,] the question of the deniability of a discharge under § 523(a)(2) is moot").

Because Lendbuzz has not demonstrated that Debtor owes an underlying debt to Lendbuzz on account of the Missing Inventory and their proceeds, Lendbuzz's nondischargeability claim under § 523(a)(6) fails as a matter of law.

### IV.   CONCLUSION

For the reasons stated herein, the Court finds that Lendbuzz Floorplan, LLC failed to meet its burden of proving the existence of a debt owed to it by Cristina Maria Naswari and therefore, Lendbuzz Floorplan, LLC's nondischargeability claim under 11 U.S.C. § 523(a)(6) fails as a

matter of law. A judgment consistent with this Memorandum Opinion will be entered on the docket

simultaneously herewith.


       **SIGNED Monday, July 27, 2026**


                                        **Eduardo V. Rodriguez**
                                 **Chief United States Bankruptcy Judge**